UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs. Case No. 3:13-cr-230-J-34MCR

SAMUEL FRANKLIN CREWS,

Defendant.
_____________________________________/

**REPORT AND RECOMMENDATION**[1]

**THIS CAUSE** is before the Court on Defendant Samuel Franklin Crews' Motion to Suppress Statements (Doc. 26), filed May 21, 2014. The United States filed a response on June 20, 2014 (Doc. 44). An evidentiary hearing was held before the undersigned on July 17, 2014.

The Court heard testimony from Special Agents Larry S. Meyer and Jonathan MacDonald of the Federal Bureau of Investigation, Special Agent Veronica Benson Edwards of the Florida Department of Law Enforcement, Defendant Samuel Franklin Crews, and Defendant's former fiancée Candace Lynn Berry. Upon consideration of the arguments from counsel and the evidence presented, the undersigned respectfully recommends the motion to suppress be **DENIED** for the reasons set forth herein.

---

[1] Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation. Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from attacking factual findings on appeal. *See* 28 U.S.C. §636(b)(1) and Local Rule 6.02(a), United States District Court for the Middle District of Florida.

## I. **Evidence Presented at the Hearing**

While working online in an undercover capacity in a peer-to-peer file sharing program, Special Agent Larry S. Meyer ("SA Meyer") of the Federal Bureau of Investigation ("FBI") located an internet protocol ("IP") address in Jacksonville that had a number of files of child pornography available for trading (Tr. 7).[2] SA Meyer issued a subpoena to Comcast Communications and determined that Defendant was the subscriber associated with the IP address (Tr. 8). SA Meyer learned that online undercover officers with the Gainesville Police Department and the Florida Department of Law Enforcement had also successfully downloaded images or videos from the same IP address. *Id*. SA Meyer obtained a search warrant for Defendant's residence in Lake City (Tr. 8-9).

The search warrant was executed on June 5, 2013 at Defendant's residence (Tr. 10). Defendant lived at the residence with his fiancée, Candace Berry ("Berry") (Tr. 166). Twelve law enforcement officers, plus a photographer, participated in the execution of the search warrant (Tr. 10). The law enforcement agencies involved included the FBI, the lead investigating agency; the Florida Department of Law Enforcement ("FDLE"); the Jacksonville Sheriff's Office ("JSO"); the Columbia County Sheriff's Office; and the Lake City Police Department. *Id*. A police canine was also present (Tr. 37).[3] Prior to the execution of the search warrant, law enforcement

[2] References to the transcript of the evidentiary hearing conducted on July 17, 2014, will be "Tr." followed by the page number that is set forth by the court reporter.

[3] Officer Larry Thomas of the Lake City Police Department was the canine handler (Tr. 48-50).

personnel met at a location near Defendant's residence for a final briefing (Tr. 11, 67-68). SA Meyer advised the officers there was no arrest warrant and there was only a search warrant to be executed. *Id*. SA Meyer advised everyone that it was important for personally owned vehicles at the residence to not get blocked in by any law enforcement vehicles (Tr. 11-12).

The execution of the search warrant began at 6:58 a.m. when the law enforcement officers arrived at Defendant's residence (Tr. 11). Defendant lived in the center unit of a one-story three-unit apartment building located at 3759 Northwest Huntsboro Street (Tr. 12; Government's Exhibit 1). The building is accessed by a shared concrete driveway off of Northwest Huntsboro Street, which has concrete pads in front of each unit for parking (Tr. 14-16; Exhibit 1). When law enforcement arrived at Defendant's unit, a marked Columbia County patrol cruiser parked in the shared driveway at the entrance to Northwest Huntsboro Street (Tr. 15-16; Government's Exhibit 1). A marked Lake City Police Department SUV parked on the grass to the left of the shared driveway (Tr. 16; Exhibit 1). Other unmarked vehicles parked in vacant parking spots in front of the building or on the grass adjacent to the building (Tr. 17; Government's Exhibits 5 & 6). Defendant's red pick-up truck and blue Hyundai Sonata were parked in the center parking spots in front of his unit (Tr. 53, 136-37; Government's Exhibits 2 & 4). When the residence was secure, the Columbia County patrol officer left the scene in his cruiser to resume other duties (Tr. 17). The patrol cruiser blocked the shared driveway for approximately five to ten minutes. *Id*. SA Meyer testified that the patrol cruiser parked in the shared driveway for traffic control

until the residence was secured because the warrant was being executed right around 7:00 a.m. on a workday (Tr. 17-18).

The law enforcement officers approached the front door in a "stacked" position, knocked on the door, and announced their presence (Tr. 20-21). Defendant and Berry were asleep in the bedroom (Tr. 137). When no one answered the door after approximately ten to fifteen seconds, eight officers forced entry into the residence with a battering ram and entered with their guns drawn (Tr. 21, 27, 39-41). Defendant heard a loud noise, got out of bed and walked through the living room toward the front door (Tr. 21, 137-38; Government's Exhibit 7). Defendant was told to lay down on the ground with guns pointed at him (Tr. 138). He laid face down on the floor and was handcuffed behind his back by Officer Larry Thomas of the Lake City Police Department (Tr. 21, 138-39). Defendant was wearing a pair of gym shorts and a tank top (Tr. 140). While the rest of the officers conducted a security sweep of the apartment, Defendant was escorted by Officer Thomas to an area just outside the front door of the residence and seated in a chair (Tr. 21, 28, 140). After the residence was cleared and secured, Defendant's handcuffs were removed (Tr. 28). SA Meyer testified that Defendant was in handcuffs for approximately two to three minutes. *Id*. SA Meyer testified that Defendant was detained for officer safety while the residence was secured (Tr. 29).

Defendant was approached by FBI Special Agent Jonathan MacDonald (Tr. 30).[4] Notably, SA MacDonald's weapon was holstered (Tr. 75). SA MacDonald introduced

[4] SA MacDonald was not in the group of officers who entered the apartment because he was assigned to secure the perimeter (Tr. 69-70). SA MacDonald may have been holding a shotgun, pointed up in the air, while the perimeter was secured (Tr. 70-72). Defendant testified he saw someone holding a shotgun (Tr.

himself to Defendant and showed Defendant his credentials (Tr. 74). SA MacDonald advised Defendant that he was not under arrest (Tr. 75-77). SA MacDonald told Defendant that handcuffs were temporarily used for officer safety and Defendant expressed that he understood (Tr. 75-76). SA MacDonald asked Defendant if he would like to speak to him, and Defendant responded affirmatively (Tr. 77, 143).

SA MacDonald walked with Defendant to the vehicle assigned to Special Agent Veronica Benson Edwards ("SA Edwards") (Tr. 77-78). The vehicle was parked on the grass beside the apartment building (Tr. 23-24, 62-63, 79, 115-16, 145; Government's Exhibits 1 & 6). The vehicle was unmarked and had no safety cage (Tr. 79-80, 145, 155). Defendant sat in the front passenger seat while SA MacDonald sat in the driver's seat (Tr. 80-81). The doors to the vehicle were unlocked and the car engine was on for use of the air conditioning (Tr. 81, 117, 122, 146). SA Edwards sat in the rear left seat of the vehicle directly behind SA MacDonald (Tr. 81). SA Edwards was armed, but her weapon was holstered (Tr. 118). SA Edwards then introduced herself to Defendant, and SA MacDonald explained the purpose of their visit before the interview began (Tr. 81-82, 120). Defendant was not given *Miranda* warnings. The interview lasted between fifty minutes and an hour and twenty minutes (Tr. 107-08, 132). During the interview, Defendant was calm, talkative and cooperative (Tr. 33, 57, 121, 156).

At the conclusion of the interview, Defendant asked if he could reenter the residence (Tr. 86, 123). SA MacDonald advised Defendant that he was not permitted to

---

140-41). SA MacDonald testified he did not remember whether he had a shotgun, but if he did, he put it in his car before approaching Defendant (Tr. 73-75, 106).

return to the residence until the search was completed (Tr. 86, 149).[5] Defendant asked if he could leave the area to go to the apartment's rental office (Tr. 85, 156). SA MacDonald advised Defendant that he was not under arrest and he was free to leave the area (Tr. 85, 125, 149). Defendant asked if he could have his car keys, and his keys were retrieved from inside the residence and provided to him (Tr. 86-87, 123, 151). Defendant entered his truck, which was located in the parking spot in front of his residence, and drove away (Tr. 87-88, 123-24, 151). Defendant returned to the residence approximately twenty to forty minutes later and parked his vehicle back in the parking spot in front of his residence (Tr. 89, 125). At the time, agents were still searching his residence. *Id*. Defendant remained outside the residence, moving about freely and engaging in small talk with the agents (Tr. 33, 90, 126-27). Defendant requested to speak to Berry (Tr. 90, 134). Berry told the agents that she did not wish to have any contact with Defendant (Tr. 31-32, 54, 90-91, 126, 134).[6] Berry called her sister to come and pick her up from the residence (Tr. 178). Berry, with the assistance of her sister, removed personal items, including clothing and food, from the residence and left (Tr. 31-32, 54, 91-92, 126, 159, 175).

---

[5] SA Meyer testified that if Defendant had needed to access the residence, he would have been escorted inside (Tr. 33). SA Meyer testified the residence was small and it would not have been conducive to have Defendant inside during the search for officer safety and to allow the search to conclude as quickly as possible (Tr. 33-34).

[6] Officers had encountered Berry in the bedroom upon their entrance into the apartment (Tr. 29, 168). She was interviewed by Special Agent Eileen Jacob and Task Force Officer Richard True from the Jacksonville Sheriff's Office (Tr. 31). Berry was not handcuffed at any time during the execution of the search warrant (Tr. 29).

The search was completed at 9:10 a.m. (Tr. 31). At the conclusion of the search, the agents packed up the seized items and left the residence (Tr. 92). SA Meyer gave Defendant a copy of the warrant and an itemized list of the items seized (Tr. 33).

Defendant was interviewed again approximately one or two weeks later at the Columbia County Sheriff's Office (Tr. 34). He voluntarily appeared for the interview. *Id*. He was not placed under arrest and was allowed to leave the interview. *Id*.

Defendant was arrested on December 31, 2013 (Tr. 35).

## II. Analysis

Defendant seeks to suppress any statements he made to law enforcement officials on June 5, 2013. Defendant argues he was in custody for *Miranda* purposes, but was not provided *Miranda* warnings, and thus his rights under *Miranda* and the Fourth and Fifth Amendments were violated. Defendant asserts his freedom of movement was restricted to the degree associated with formal arrest. The United States contends Defendant was not in custody during the interview, and *Miranda* warnings were not required. The United States argues Defendant's brief detention while his residence was being cleared was constitutionally permissible and did not render him in custody for purposes of *Miranda*. Thus, the issue presented in this case is whether Defendant was in custody and therefore entitled to *Miranda* warnings.

The Fifth Amendment provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Fifth Amendment permits a person to refuse to testify against himself at a criminal trial and to refuse to answer questions put to him in any other proceeding, civil or criminal, formal or

informal, where the answers might incriminate him in future criminal proceedings. *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). *Miranda v. Arizona* extended the Fifth Amendment privilege against compelled self-incrimination to persons subjected to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* held custodial interrogation was inherently coercive and therefore created a presumption that a statement made while subject to custodial interrogation was coerced, unless a suspect was specifically informed of certain rights and freely decided to forgo those rights. *Id*. at 467; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). These warnings are required to provide "practical reinforcement" for the Fifth Amendment privilege against self- incrimination. *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

The right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). "An interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (citing *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000)). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). Whether a defendant is in

custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (quotation marks and alterations omitted). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)) (internal quotation marks omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Moya*, 74 F.3d at 1119.

The Supreme Court has clarified that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113, 130 S.Ct. 1213, 1224, 175 L.Ed. 1045 (2010). In other words, "a free-to-leave inquiry reveals only whether the person in question was seized. While seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (internal quotations and citations omitted) (alterations in original). "[A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been 'seized' by law enforcement – he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *Id*. (citing *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006)).

Considering the totality of the circumstances, the factors weigh in favor of finding Defendant's interview non-custodial. The fact that Defendant was physically detained and handcuffed at gun point upon the officers' initial entry into his apartment to execute the search warrant does not necessitate a finding that Defendant was under arrest or in custody. The Supreme Court has distinguished detention of an individual while a search warrant is executed from the level of restraint associated with formal arrest. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The actions taken by the law enforcement agents – forcibly entering Defendant's residence with weapons drawn, ordering Defendant to lay on the ground, handcuffing Defendant and escorting him outside of the house – were actions taken to ensure law enforcement's safety in connection with the execution of the search warrant and fall short of the degree of restraint associated with formal arrest. *See United States v. Toumasian*, No. 1:10-cr-291-TCB-JFK-3, 2011 WL 3798223, at *11 (N.D. Ga. July 19, 2011) (finding defendant was not in custody when six to ten officers used force to breach the door of his residence, had their weapons drawn when entering and securing the residence, had the defendant lie face down on the floor where he was handcuffed, and asked the defendant questions while he sat upright against a wall, still handcuffed, in the living room area while the search was being executed).

Nor do the totality of circumstances show that Defendant was in custody after he was removed from the residence. Upon exiting the residence, Defendant was immediately un-handcuffed and informed he was not under arrest. Defendant was given an explanation for the brief detention and indicated he understood why he had

been handcuffed.  He was asked if he wished to speak with SA MacDonald and he replied he did.  "Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"  *Brown*, 441 F.3d at 1347-48 (quoting *Muegge*, 225 F.3d at 1271).  Although SA MacDonald may not have used the exact phrase "free to leave," SA MacDonald told Defendant that he was not under arrest, both before and after the interview, which is a "powerful factor" in favor of a finding that Defendant was not in custody, particularly where there were no extensive restraints placed upon Defendant during or after the interview.[7]

The location of the interview is also a significant factor to consider when determining whether a defendant was in custody.  "Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  *Brown*, 441 F.3d at 1348 (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (alterations and quotation marks omitted)).  Here, the interview took place in an unmarked, unlocked government vehicle that was parked on the grass beside Defendant's residence, which weighs in favor of a finding that Defendant was not in custody.  *See United States v. Dix*, No. 3:12-cr-7-

---

[7] Although Defendant testified he was never told that he was not under arrest, the Court finds the testimony of SA MacDonald and SA Edwards to be more credible.

TCB-RGV, 2013 WL 610219 (N.D. Ga. Jan. 29, 2013) (finding defendant was not in custody when officers entered his store with weapons drawn to execute search warrant, handcuffed defendant, and escorted defendant outside where he was immediately un-handcuffed and then interviewed by two agents in an unmarked government truck for an hour and a half); *United States v. Johnson*, No. WDQ-10-0799, 2011 WL 6202847, at *4 (D.Md. Dec. 7, 2011) ("A suspect is not in custody simply because law enforcement officers tell her they would like to question her, or speak to her inside a confined space like a vehicle.  That a suspect answers questions in a police vehicle, with the doors and windows closed, does not necessarily create custodial interrogation." (citations omitted)) *Sturm v. Darnell*, No. 2:10-cv-247, 2012 WL 220211, at *7 (S.D. Ohio Jan. 25, 2012), report and recommendation adopted at 2012 WL 604229 (finding defendant was not in custody when he was told he was free to leave at any time and did not need to speak with officers, and was interviewed in front of his residence in an unmarked police car that was indistinguishable from a regular passenger vehicle).

Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the interviewee at the end of the questioning."  *Matcovich*, 522 F. App'x at 851 (citing *Street*, 472 F.3d at 1309; *Howes v. Fields*, --- U.S. ---, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (internal quotation marks omitted)).  Here, the interview lasted approximately an hour, which is not an excessive or unreasonable amount of time.  *See*

*United States v. MacDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) (noting “there is no fixed limit to the length of questioning” and finding a four-hour interview was not a custodial interrogation). Defendant sat in the front seat of the car and was not restrained in any way. He was not handcuffed throughout the interview. Although the agents were wearing weapons, there is no evidence that they ever drew those weapons or touched or physically intimidated Defendant. Defendant never asked to stop the interview. The interview ended when the agents did not have any further questions for Defendant. When Defendant desired to leave the premises, he was told he was free to leave, and he did in fact leave for a period of time. Although Defendant’s driveway was blocked for a period of time during the execution of the search warrant, his truck was not blocked when he left the premises and he was not prevented from leaving. Defendant was kept away from Berry, but this was at her request. At the conclusion of the interview, Defendant was able to move freely about the outside of his residence until the search was completed, and he was not formally arrested until six months later.

In sum, the Court is not persuaded that the circumstances of Defendant’s June 5, 2013 interview – where Defendant sat unrestrained in the front seat of an unmarked, unlocked police car parked beside his residence after he had been told he was not under arrest – “present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.” *Howes*, 132 S.Ct. at 1189. Nor does the fact that Defendant was temporarily detained during the execution of the search warrant convert the interview into a custodial interrogation. There was no restraint on Defendant’s freedom of movement to the degree associated with formal arrest. The

totality of circumstances demonstrate that Defendant was not in custody when he was interviewed on June 5, 2013 and, therefore, *Miranda* warnings were not required. *See Matcovich*, 522 F. App'x at 852 (holding interview during execution of search warrant in defendant's residence was noncustodial where entry by law enforcement created a "police-dominated atmosphere with a number of officers handcuffing residents and bringing them to a central location," but where, "shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told that they were not under arrest"); *United States v. Graham*, No. 3:13-cr-11-TCB, 2014 WL 2922388, at *3, 6 (N.D. Ga. June 27, 2014) (finding defendant was not in custody when fifteen agents entered residence with guns drawn while yelling "police, search warrant," handcuffed defendant briefly, escorted him to a basement in the residence for questioning, and during the interview told the defendant that he was not in custody); *United States v. Peck*, --- F.Supp. 2d ---, No. 1:13-cr-171, 2014 WL 1572437, at *1 (N.D. Ga. Apr. 18, 2014) (finding defendant was not in custody when he was questioned by two agents in small bedroom with closed door away from his family for one hour during execution of search warrant); *United States v. Manta-Carillo*, No. 11-00103-CB, 2011 WL 3235757, at *4 (S.D. Ala. July 28, 2011) (finding no custodial interrogation where defendant was not physically restrained, he was not placed under arrest before or after the interview, he was subsequently allowed to leave the country in his vessel, he never asked to leave the interview, agent told defendant he would be free to leave when the interview was over, there were obvious restrictions on defendant's freedom of movement, and there were as many as six agents in the room during the interview).

## III. Conclusion

Based on the foregoing, the undersigned respectfully recommends Defendant Samuel Franklin Crews' Motion to Suppress Statements (Doc. 26) be **DENIED**.

**DONE AND ENTERED** in Jacksonville, Florida this 13th day of August, 2014.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record